1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

UNITED STATES OF AMERICA,            )
                                     )
                        Plaintiff,   )        Case No. 2:07-cr-00145-KJD-PAL
                                     )
vs.                                  )        **REPORT OF**
                                     )     **FINDINGS AND RECOMMENDATION**
MICHAEL WAYNE YOST,                  )
                                     )          (M/Suppress - Dkt. #422)
                        Defendant.   )
_____)

        This matter is before the court on defendant Michael Wayne Yost's Motion to Suppress

Evidence for Fourth Amendment Violation (Dkt. #422) which was referred the undersigned for a report

of findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-3 and IB 1-4.

The court has considered the motion, the government's Response (Dkt. #462), and Yost's Reply

(Dkt. #482).

                              **BACKGROUND**

        Defendant Michael Wayne Yost ("Yost") is charged in a Superseding Indictment (Dkt. #181)

with RICO conspiracy and drug conspiracy.  In the current motion, he seeks to suppress evidence

obtained from a search of a residence at 5920 Vicki Ann Road in Pahrump, Nevada, on June 28, 2006.

The search warrant was applied for by Detective Trevor Meade of the Nye County Sheriff's Office and

approved by Nye County Justice of the Peace Tina Brisebill.

        **A.      Yost's Arguments**

        Yost asserts that the information Detective Meade provided to support this search warrant is too

stale to support a finding of probable cause because all of the relevant events and alleged criminal

activity related in the affidavit occurred in July and August of 2005, ten to eleven months prior to the

application for the warrant.  Second, Yost argues there was no probable cause to justify seizure of

1   computer equipment at the residence.  Third, Yost contends the affidavit lacked probable cause to

2   authorize a search for items of personal property which would tend to establish the identity of persons

3   in control of the residence.  Probable cause was lacking, Yost asserts, because ownership or control of

4   the residence is not evidence of a crime, and because officers knew Yost and his wife lived at the

5   address, therefore, seizure of these items was "not necessary to dispel any confusion or uncertainty as to

6   who lived at the address."  Motion, 12:21-24.  Further, he argues that the affidavit fails to establish

7   probable cause that firearms and ammunition, items relating to gang activity, and evidence that Yost

8   was involved in the sale or production of narcotics would be found in the searched premises.  As a

9   result, Yost argues that all evidence obtained or derived from the search of the residence at 5920 Vicki

10  Ann Road must be suppressed as the "fruit of the poisonous tree."

11      **B.      The Government's Response**

12          The government response argues that the affidavit supporting the search warrant established

13  probable cause to believe the items specified would be found in the searched premises.  The

14  government acknowledges that a warrant lacks probable cause if it is based on stale information.

15  However, the government contends that the affidavit as a whole establishes that Yost and co-defendant

16  Axtell were involved in an ongoing drug operation connected to a violent prison gang engaged in

17  racketeering activity.  The government suggests that some of the items seized during execution of the

18  search warrant such as false identification documents were seen in plain view and, therefore,

19  appropriately seized.  Finally, the government argues that even if the warrant was "flawed," the

20  evidence in this case should not be suppressed under the good faith exception to the exclusionary rule

21  recognized by Supreme Court in United States v. Leon, 468 U.S. 897, 920 (1984).

22          Yost replies that Detective Meade's conclusory statements are insufficient to establish probable

23  cause and that the results of the search cannot justify the initial seizure.  He reiterates his arguments that

24  Detective Meade's bare conclusions and statement of beliefs are insufficient to establish probable

25  cause, especially with respect to computer equipment seized at the Yost residence.  Finally, he argues

26  that the good faith exception does not save this search warrant because the Justice of the Peace

27  abandoned her judicial role and acted as a rubber stamp for the police by issuing this warrant with

28  numerous deficiencies.

**DISCUSSION**

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. Katz v. United States, 389 U.S. 347 (1967). The Fourth Amendment protects "people not places." Id. Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471 (1963).

### A.   Evidentiary Hearing

Yost's motion to suppress contained a request for an evidentiary hearing in the caption but did not articulate any reason for conducting an evidentiary hearing. At a January 14, 2009 status conference in this case, the court inquired of counsel for Yost whether there were any contested issues of fact that required an evidentiary hearing, and counsel indicated that an evidentiary hearing was not required. However, at the February 27, 2009 status hearing, counsel advised the court that he had spoken with his client who wanted an evidentiary hearing. Aside from indicating his client wanted an evidentiary hearing, and that he believed an evidentiary hearing was warranted, counsel for Yost articulated no reasons why the court should conduct one.

The United States Court of Appeals for the Ninth Circuit has held that an evidentiary hearing on a motion to suppress need only be held if the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the court to conclude that contested issues of material fact exist. United States v. Howell, 231 F.3d 615, 620 (9th Cir. 2000), citing, United States v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986); United States v. Harris, 914 F.2d 927, 933 (7th Cir. 1990); United States v. Irwin, 613 F.2d 1182, 1187 (9th Cir. 1980); United States v. Carrion, 463 F.2d 704, 706 (9th Cir. 1972) ("Evidentiary hearings need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that relief must be granted if the facts alleged are proved."). "A hearing will not be held on a defendant's pre-trial motion to suppress merely because a defendant wants one. Rather, the defendant must demonstrate that a 'significant disputed factual issue' exists such that a hearing is required." Howell, 231 F.3d at 621, citing, Harris, 914 F.2d at 933. The determination of whether an evidentiary hearing is appropriate rests

1  in the reasoned discretion of the district court.  United States v. Santora, 600 F.2d 1317, 1320 (9th Cir.),

2  amended by 609 F.2d 433 (1979).  Yost's motion does not allege that there are any significant disputed

3  factual issues.  Rather, he has asked for an evidentiary hearing because he wants one.  His moving

4  papers have not alleged any disputed or contested issues of material fact, and his request for an

5  evidentiary hearing is, therefore, denied.

6       **B.**    **Probable Cause to Support a Search Warrant**

7       Probable cause is required to justify certain governmental intrusions upon interests protected by

8  the Fourth Amendment.  See Ornelas v. United States, 517 U.S. 690, 695 (1996); Illinois v. Gates,

9  462 U.S. 213, 241 (1983).  Probable cause to search exists when there is "a fair probability that

10 contraband or evidence of a crime will be found in a particular place," i.e., the place to be searched.

11 Gates, 462 U.S. at 238.  "Whether there is a fair probability depends upon the totality of the

12 circumstances, including reasonable inferences, and is a 'common sense, practical question.'" United

13 States v. Kelley, 482 F.3d 1047 (9th Cir. 2007), citing United States v. Gourde, 440 F.3d 1065, 1069

14 (9th Cir. 2006) (en banc).

15      A determination of whether probable cause exists is made by examining the totality of the

16 circumstances.  Gates, 462 U.S. at 241.  The Supreme Court has repeatedly emphasized that the

17 probable cause standard is a "practical, non-technical conception."  Brinegar v. United States,

18 338 U.S. 160, 176 (1949).  A probable cause determination is two-fold.  First, a court must determine

19 "historical facts," that is, the events leading up to the stop or search.  Ornelas, 517 U.S. at 696.  Second,

20 the court must determine "whether those historical facts, viewed from the standpoint of a reasonable

21 police officer," amount to probable cause.  A judge's decision regarding probable cause should be given

22 great deference.  Id. at 698-99.  The duty of a reviewing court is to ensure that the magistrate had a

23 substantial basis for concluding that probable cause existed.  Id.; see also United States v. Neilsen,

24 371 F.3d 574, 579 (9th Cir. 2004).  A reviewing court is required to examine all the circumstances set

25 forth in the affidavit, and in doubtful cases, to give preference to the validity of the warrant.  United

26 States v. Peacock, 761 F.2d 1313, 1315 (9th Cir. 1985), cert. denied, 474 U.S. 874 (1985).

27      Facts supporting probable cause can come from several sources, including the observations of

28 law enforcement who use their expertise and training to draw inferences of criminal activity from

1   behavior that is not criminal on its face.  See, e.g., Alford v. Haner, 446 F.3d 935, 937 (9th Cir. 2006)

2   (probable cause to arrest for impersonating officer where police observed police radio, scanner, and

3   handcuffs in car).  Law enforcement can also use facts ascertained from a confidential informant.  See,

4   e.g., United States v. Reeves, 210 F.3d 1041, 1045-46 (9th Cir. 2000) (probable cause for search

5   warrant even though informant had criminal record because informant had previously provided reliable

6   information).  Moreover, a "magistrate may rely on the conclusion of experienced law enforcement

7   officers regarding where evidence of a crime is likely to be found."  United States v. Fannin,

8   817 F.2d 1379, 1381 (9th Cir. 1987).  An officer need not include all information in his possession to

9   obtain a search warrant, but instead, need only show facts adequate to support a finding of probable

10  cause.  United States v. Johns, 948 F.2d 599, 605 (9th Cir. 1991).  "Trustworthy information" must be

11  used to support a probable cause determination and can include a tip from an informant so long as the

12  tip is reliable.  See Gates, 462 U.S. at 283.  Reliability may be shown by the informant's past record of

13  reliability, through independent confirmation, personal observation by law enforcement, or other means.

14  See Alabama v. White, 496 U.S. 325 (1995).

15      When a search warrant is based solely on an informant's tip, the "proper analysis is whether

16  probable cause exists from the totality of the circumstances to determine a sufficient level of reliability

17  and basis of knowledge for the tip."  United States v. Bishop, 264 F.3d 919, 924 (citing Gates, 462 U.S.

18  at 238).  One of the factors that courts consider is the informant's basis of knowledge – that is "how

19  the informant came by his or her knowledge."  Id. at 925 (citing United States v. Angulo-Lopez,

20  791 F.2d 1394, 1396 (9th Cir. 1986)).  In Bishop, the Ninth Circuit found that because the informant

21  had first-hand knowledge that the defendant had "cooked" methamphetamine the day before the

22  application for the search warrant was made, the informant's tip was more reliable.  "The veracity of an

23  informant's information is also considered when reviewing the totality of the circumstances."  Id. at

24  925.  A court may find an informant's information is reliable based on independent police corroboration

25  of the information provided by an informant.  Id., citing United States v. Freitas, 716 F.2d 1216, 1222

26  (9th Cir. 1983).  A court may also consider whether an informant's information is an admission against

27  penal interest in evaluating the reliability of the informant's information.  Id., citing United States v.

28  Harris, 403 U.S. 573, 583-84 (1971).

A redacted application and affidavit for this search warrant is attached as Exhibit "A" to Yost's motion to suppress.  Yost filed a Motion to Compel (Dkt. #163) seeking to compel the government to produce the search warrant affidavit and related materials.  The search warrant was sealed by the issuing state court judge.  The government filed a Response (Dkt. #169), asserting the confidential informant privilege recognized in <u>Roviaro v. United States</u>, 353 U.S. 53 (1957).  The government also asserted that inasmuch as the state judge had issued the warrant and had entered an order sealing it, government counsel did not have a copy of the search warrant application.  The government objected to unsealing the affidavit supporting the search warrant based on its concerns for the informant's safety and the integrity of its ongoing investigation.  At a hearing conducted April 4, 2008, the court directed the government to show good cause why the affidavit supporting the search warrant at the defendant's residence which uncovered evidence that the government intends to introduce in this case should remain under seal.  Counsel for the government submitted a Declaration of Trevor Meade (Dkt. #229) supporting the government's request to keep the affidavit under seal.  In it, Detective Meade averred that the affidavit contained information concerning a confidential informant who provided information to investigators in the case.  The affidavit outlined his experience with the Aryan Warriors' membership and activity in the Pahrump valley, gave examples of violent incidences involving the Aryan Warriors in the Pahrump area and opined that if the identity of the confidential informant was disclosed, he or she would targeted for murder.

At a hearing conducted May 21, 2008, the undersigned directed the government to obtain a copy of the affidavit supporting the search warrant for *in camera* review.  The government applied for, and received, an order from Judge Brisebill, unsealing the affidavit for the undersigned's review *in camera*.  At a hearing conducted August 8, 2008, the court indicated its intention to order a redacted copy of the search warrant affidavit be produced to counsel for Yost, redacting any information that might identify the confidential informant.  Counsel for the government indicated she did not oppose production of an appropriately redacted affidavit and that she would be meeting with Detective Meade to propose redactions to the affidavit.  The undersigned received a redacted version of the affidavit August 13, 2008 and reviewed it *in camera*.  The court compared the original sealed affidavit of Detective Meade with the redacted version of the affidavit and found that the redactions pertained to information about

6

1    the confidential informant, the disclosure of which could identify the confidential informant.  The court

2    also found that disclosing the unredacted portions of the affidavit, which contained information which

3    could effectively reveal the identity of the confidential informant, would endanger the confidential

4    informant.  Accordingly, the court granted in part and denied in part Yost's motion to compel.  The

5    court required the government to serve counsel for Yost with a copy of the redacted version of the

6    affidavit submitted to the court *in camera* on August 13, 2008 and denied the motion is all other

7    respects.  See Order (Dkt. #352).  Yost did not object to this procedure or the undersigned's rulings as

8    permitted by 28 U.S.C. § 636(b)(1)(A) and LR IB 3-1.

9           The court has reviewed the unredacted version of the affidavit *in camera*, as well as the redacted

10   affidavit which counsel for Yost received and attached to his motion to suppress.  Detective Meade's

11   affidavit related that he was employed by the Nye County Sheriff's Office and assigned to the Pahrump

12   substation since March 1999.  The affidavit outlined his training and experience in narcotics

13   investigations and sought judicial authorization to search a residence at 5920 Vicki Ann Road in

14   Pahrump, Nye County, Nevada.  The affidavit requested permission to search for and seize narcotics

15   and, specifically, methamphetamine; drug paraphernalia; cash or material goods tending to show profits

16   in dealing narcotics; telephone books, address books, and other records of narcotics transactions;

17   limited items of personal property tending to show the identity of persons in control of the premises;

18   firearms and ammunition; writings and other items relating to gang activity.  The search warrant also

19   sought permission to search computer hardware, software, and related items.

20          Detective Meade's affidavit related that beginning in the early part of 2005, he became aware

21   that Michael Yost resided in Pahrump.  Meade knew Yost was involved in the Aryan Warriors, a

22   Nevada prison gang.  During this period of time, he observed Yost "hanging around with" Jeff

23   Martindale who was also known to be involved with the Aryan Warriors.  Meade knew Yost was living

24   at 5920 Vicki Ann Road and that Martindale lived at 5911 Vicki Ann Road in Pahrump.  In the early

25   part of 2005, Meade began working with an investigator from the state Inspector General's Office,

26   William Reubart, who was assigned to the Nevada prison system.  Meade and Reubart exchanged

27   information that a number of Aryan Warriors "were currently paroling to Pahrump."  Reubart told

28   Meade that Yost was a suspect in a case involving heroin, methamphetamine, marijuana, and

1   hypodermic devices being smuggled into the Nevada prison system for Charles Axtell, an individual
2   affiliated with the Aryan Warriors.
3       On July 23, 2005, the Nye County Sheriff's Office ("NCSO") received a report of shots fired in
4   the 5900 block of Vicki Ann Road.  Meade informed responding deputies at the scene of possible gang
5   activity based on his knowledge that Yost and Martindale lived across the street from each other.
6   Meade went to the scene and discovered Martindale was the shooter and had fled on foot.  Meade
7   obtained a search warrant for Martindale's residence.  The search warrant recovered evidence of the
8   shooting and numerous items pertaining to prison gang activity.  Among the items recovered were
9   letters written to Martindale from Yost, indicating Yost would help Martindale get established once he
10  paroled.  There were other letters written to Martindale from another inmate, Brian Mathieson, who was
11  affiliated with white supremacist prison gang activity.  Photographs of Yost and Martindale together
12  were also recovered inside Martindale's residence.  As a result of his investigation, Meade obtained a
13  warrant for Martindale's arrest.
14      Martindale was later killed by Boulder City Police in a shootout.  However, while Meade was
15  looking for Martindale, Meade was aware that Martindale and Yost had been very close friends and
16  "the word on the street was that they were selling narcotics."  Redacted portions of the affidavit referred
17  to information provided by a confidential informant.  The unredacted portion of the affidavit reflects
18  Meade asked the informant whether he or she knew of any Aryan Warriors paroled in Pahrump.  The
19  informant identified Mike Yost.  The informant described Yost as a "shot caller" on the prison yard.
20  Meade described a "shot caller" as someone who runs or controls a certain yard in a prison system.  The
21  informant told Meade that Yost has always been involved in narcotics and was very involved in dealing
22  narcotics while inside prison.  The informant told Meade that individuals were selling drugs for
23  themselves and that the rest of the drugs and money "went to the benefit of the Aryan Warriors
24  organization."
25      Meade's affidavit described the Aryan Warriors as a "blood in, blood out" organization, *i.e.*,
26  members join forever.  Meade related that if an inmate paroles from prison, he is expected to obtain and
27  sell drugs on the street and get them into prison for his incarcerated brothers.  Paroled inmates are also
28  / / /

8

1    expected to commit crimes to put money on the books of incarcerated brothers and carry out assaults,

2    beatings, murders, *et cetera*.

3          Detective Meade related that on August 14, 2005, he received information Yost was being

4    arrested for a parole violation.  He went to the detention center to interview Yost to find out where

5    Martindale was hiding.  Yost told Meade that he would tell Meade where Martindale was if Meade got

6    him out of jail.  Meade did not believe Yost would provide information about where Martindale was

7    hiding if Yost was released.  Meade took photographs of wizard and Viking tattoos on Yost, stating

8    they are "very popular amongst white supremacists."  Meade observed a tattoo on Yost's right arm,

9    with sharp pointed lightning bolts which he recognized as a tattoo that is usually earned from an

10   organization like the Aryan Warriors for committing an act of extreme violence against a rival

11   organization.  During the interview, Yost acknowledged knowing Aryan Warriors from his number of

12   years in prison.

13         On June 28, 2006, Inspector Reubart came to Pahrump and delivered a disk to Meade of

14   intercepted calls between Axtell, who was in prison, and Yost.  Some portions of the calls were

15   "heavily coded," but in other parts of the calls, Axtell and Yost were clearly talking about narcotics.

16   Meade related the substance of two telephone conversations in the affidavit and stated that during the

17   conversation, Yost mentioned using his computer.  Meade stated that some of the conversation was

18   clearly code for manufacturing methamphetamine.  Numbers and exchanges were discussed.  Axtell and

19   Yost also talked about another inmate who was a "an old Aryan Warrior" and one of the best customers

20   of another inmate incarcerated with Axtell.

21         Meade's affidavit related Yost's criminal history which included arrests and convictions dating

22   from 1972 through 1987 for various offenses, including multiple narcotics related offenses, as well as

23   burglary, theft, bad check charges, possession of stolen vehicle, parole violation, fugitive charges, and

24   conviction for robbery with use of a deadly weapon.  In 1987, Yost was sentenced to consecutive terms

25   in the Nevada state prison for armed robbery, released, rearrested for violation of parole, and sentenced

26   to finish his sentence.  Yost had been recently released from a Nevada state prison on this charge a few

27   months prior to the time the affidavit was prepared.

28   / / /

1    Meade related that Yost was married to Debra Yost.  A check with the Nye County Assessor's
2    Office listed Yost and his wife, Debra, as co-owners of the residence at 5920 Vicki Ann Road in
3    Pahrump.  Debra Yost's aliases and extensive criminal history were related.

4    Meade described the Aryan Warriors as a violent organization "made up of the worst of the
5    worst of the white convicts in Nevada's prison system."  Paroled members stay loyal to the organization
6    and have access to drugs and money on the street which they smuggle in to incarcerated members to be
7    sold.  The earnings of outside drug sales are placed on the books of incarcerated members to make their
8    life easier.  Incarcerated members are involved in murder, extortion, violent batteries, drug dealings,
9    and internet scams.  Meade related two examples of "hundreds of violent incidences" he was aware of
10   over the years involving Aryan Warriors who were sent to prison from Pahrump.  He was aware of an
11   Aryan Warrior who violently beat an Aryan Warrior who had dropped out of the organization and was
12   working with law enforcement.  He was also aware that while Martindale was in prison, he stabbed
13   another inmate and beat two corrections officers who sustained lifelong injuries.  Meade was aware
14   Aryan Warriors were heavily populating Pahrump after being paroled.

15   The affidavit relied upon information provided by Reubart concerning intercepted letters and
16   phone calls at the prison in which Aryan Warriors had talked about activities in Pahrump by members
17   paroled or discharged.  Meade's affidavit stated that he believed Yost was currently involved in
18   narcotics trade and that letters and other writings to and from Aryan Warrior members would be located
19   inside the residence.  He believed that these writings would contain "extremely important intelligence
20   as to possible criminal activity that paroled members are partaking in, where members are living, who
21   Yost is staying in contact within the inside, etc."  He also stated he believed that evidence may exist to
22   "further establish the Yost/Axtell drug connection."  He described the searched premises and requested
23   that the affidavit be sealed to protect the confidential informant.  He also asked for authorization for
24   nighttime service.  Judge Brisebill found probable cause and issued the search warrant for the items
25   requested.

26                                        **ANALYSIS**

27   Neither side provided the court with a copy of the search warrant return or an inventory of items
28   seized from the searched premises.  The search warrant sought judicial authorization to search for and

10

1    seize evidence of narcotics violations and, specifically, narcotics violations related to the Aryan
2    Warriors prison gang.  Reviewing the affidavit as a whole, applying the totality of the circumstances
3    test, and showing the issuing judge great deference as mandated by the United States Supreme Court,
4    this court concludes the issuing judge had a substantial basis for concluding probable cause existed for
5    the issuance of the search warrant.  As the Supreme Court in Gates recognized, "only the probability,
6    not a *prima facie* showing of criminal activity, is the standard of probable cause." 462 U.S. at 235.  The
7    evidence presented to Judge Brisebill, taken as a whole, established the probability that evidence of
8    narcotics violations and ties with the Aryan Warriors prison gang would be found in the searched
9    premises.  The affidavit failed to establish probable cause to believe firearms and ammunition would be
10   found in the searched premises.  The affidavit contains no information tying Yost to firearms or
11   ammunition at all.  The only references to firearms in the affidavit concerned Meade's investigation of
12   Martindale for a shooting at Martindale's residence across the street from Yost and the recovery of
13   "evidence of a shooting" from a search warrant executed at Martindale's residence.  However, it does
14   not appear that any firearms and ammunition were seized in the search.
15          The government provided a description of items that were seized in the search in its response.
16   The government's opposition indicates Detective Meade seized correspondence with prison inmates; a
17   "fraudulent letter" written to the Nevada Parole Board Commissioner by Debra Yost, using the false
18   name Debra Young; inmate photographs and drawings; address books containing the names of several
19   known members of the Aryan Warriors and their associates; phony "legal mail stickers" and attorney
20   address labels; false Nevada drivers licenses bearing alias names and fake social security numbers;
21   cleared and uncleared fraudulent checks; fraudulent drivers license templates; fraudulent Nevada
22   identification and drivers license cards; and several blank check templates.  The government also
23   indicates Detective Meade seized a plastic baggie containing methamphetamine and a prescription pill
24   bottle with the name Patrick Hays, containing Naproxen; paint thinner; fifty-two bottles of antifreeze;
25   numerous photographs of Michael and Debra Yost; a computer hard drive; a Yamaha quad with an
26   altered vehicle identification number; and a boat and trailer with no vehicle identification number.
27          Yost argues that the affidavit lacked probable cause to authorize a search for items of personal
28   property tending to establish the identity of persons in control of the residence but does not otherwise

11

1  challenge the scope of the search warrant.  "The scope of a lawful search is 'defined by the object of the

2  search.'" United States v. Ewain, 88 F.3d 689, 692 (9th Cir. 1996), quoting Maryland v. Garrison,

3  480 U.S. 79, 84 (1987).  The test is an objective one: "would a reasonable officer have interpreted the

4  warrant to permit the search at issue." United States v. Gorman, 104 F.3d 272, 274 (9th Cir. 1996).

5    The Ninth Circuit has held that "[i]t is axiomatic that if a warrant sufficiently describes the

6  premises to be searched, this will justify a search of the personal effects therein belonging to the person

7  occupying the premises if those effects might contain the items described in the warrant." United States

8  v. Gomez-Soto, 723 F.2d 649, 654 (9th Cir. 1994).  The Ninth Circuit has long upheld warrants

9  "authorizing the seizure of items which establish the identity of persons in control of the premises."

10  United States v. Whitten, 706 F.2d 1000 (9th Cir. 1983); citing United States v. Marques, 600 F.2d 742,

11  751 n. 5 (9th Cir. 1979), cert. denied, 444 U.S. 1019 (1980).

12    In Whitten, the Ninth Circuit upheld that a search warrant authorizing the seizure of telephone

13  books, diaries, photographs, utility bills, telephone bills, and any other types of papers indicating the

14  ownership or occupancy of the residence.  The trial court found there was probable cause to search two

15  residences for evidence of a methamphetamine laboratory.  The Ninth Circuit upheld the trial court's

16  denial of a motion to suppress, finding probable cause supported the warrant and rejecting the

17  defendant's claim that the search for the records described was impermissibly broad.  The Court of

18  Appeals held that "where multiple defendants were suspected to have utilized the premises as a

19  laboratory and headquarters for a large-scale illegal drug operation, it was reasonable to authorize the

20  arresting agents to search for evidence showing who occupied and controlled the premises." Id. at

21  1009.

22    From the government's description of the items seized from the searched premises, it appears

23  that a number of items not specifically authorized in the warrant were seized.  Neither side addressed

24  this issue in their moving or responsive papers, although the government's response suggests some of

25  the items were seized under the plain view exception.  The plain view doctrine is an exception to the

26  search warrant requirement and permits seizure of items of evidence if the police have probable cause

27  to believe an item is evidence after an inspection of "what is already exposed to view." Arizona v.

28  Hicks, 480 U.S. 321, 322 (1987).  In Hicks, a police officer was lawfully on the defendant's premises

12

1   and moved stereo components, which he had reasonable suspicion but not probable cause to believe

2   were stolen, in order to view the components' serial numbers.  The Supreme Court concluded that this

3   movement was a search, and held that the plain view doctrine could not justify the search or seizure of

4   the components because the police lacked probable cause to believe they were stolen.  In holding that

5   probable cause was necessary to justify the search of the components and the subsequent seizure, the

6   court stated there was no reason why an item found in plain view could be seized on "lesser grounds . . .

7   than would have been needed to obtain a warrant for that same object if it had been known to be on the

8   premises."  Id. at 327-29.  Similarly, in Minnesota v. Dickerson, the Supreme Court reiterated that for

9   the plain view doctrine to justify a seizure, the incriminating nature of an object must be apparent.  The

10  court explained that the incriminating nature of the object is immediately apparent if police have

11  probable cause to believe an object in plain view is contraband.  508 U.S. 366, 375 (1993).  See also

12  United States v. Garcia, 205 F.3d 1182, 1187 (9th Cir.), cert. denied, 531 U.S. 856 (2000) ("The 'plain

13  view' exception requires: (1) that the initial intrusion must be lawful; and (2) that the incriminating

14  nature of the evidence must be immediately apparent to the officer.") (citation omitted).

15      The court cannot determine from the moving and responsive papers what evidence the

16  government intends to introduce at trial or whether the plain view doctrine justifies the seizure of all of

17  the items seized in this case.  Specifically, the court has no information regarding whether any evidence

18  was seized from Yost's computer.  Similarly, the court has no information concerning how officers

19  determined one of the vehicles had an altered serial number or that the boat and trailer seized had no

20  vehicle identification number.  The court, therefore, recommends that before the government seeks to

21  introduce evidence at trial not specifically identified in the search warrant, the government should be

22  required to establish that the evidence was found where officers were lawfully authorized to be during

23  the execution of the search warrant and that the incriminating nature of the evidence was immediately

24  apparent to seizing officers.

25      Finally, Yost claims that the information supporting this search warrant was too stale to support

26  a finding of probable cause.  The court disagrees.  The affidavit related information derived from an

27  investigation which spanned from the beginning of 2005 through June 28, 2006 that Yost and members

28  of the Aryan Warriors were engaged in ongoing narcotics trafficking.  The Ninth Circuit has held that in

1   evaluating the staleness of information supporting a search warrant "mere lapse in time is not

2   controlling." United States v. Dozier, 844 F.2d 701, 707 (9th Cir. 1988).  The Ninth Circuit has also

3   held that "the continuous nature of the activity diminishes the significance of the time lag between

4   the acts described in the affidavit and presentation of the affidavit to the magistrate." United States v.

5   Landis, 726 F.2d 540, 542 (9th Cir. 1984).  See also United States v. Hernandez-Escarsega,

6   886 F.2d 1560, 1566 (9th Cir. 1989) ("where affidavits established the existence of a widespread,

7   firmly entrenched, and ongoing narcotics operation in which the defendant was a key player, staleness

8   argument lost much of its force").

9         Here, Detective Meade's affidavit related Yost's association with the Aryan Warriors, a "blood

10   in, blood out" prison gang whose members are expected to remain members for life.  The affidavit

11   detailed the relationship between incarcerated and paroled members of the Aryan Warriors and their

12   participation in narcotics trafficking, both in and out of prison, for the benefit of individual members

13   and the organization.  Detective Meade listened to telephone conversations recorded between Yost and

14   co-defendant Charles Axtell, who is also a member of the Aryan Warriors, on June 28, 2006, the same

15   day the warrant was applied for and issued.  Although portions of the calls were "heavily coded,"

16   Detective Meade averred that the conversations related to manufacturing methamphetamine.  The court

17   finds that the information provided in the search warrant was not so stale that the issuing judge lacked a

18   substantial basis for issuing the warrant.

19         The government argues that even if the search warrant in this case was "flawed," the good faith

20   exception precluded suppression of evidence derived from the search of Yost's residence.  In United

21   States v. Leon, 468 U.S. 897 (1984), the United States Supreme Court held that the exclusionary rule

22   should not bar evidence obtained by officers acting in reasonable reliance on a search warrant issued by

23   a detached and neutral magistrate, but ultimately found to be unsupported by probable cause.  Adopting

24   a good faith reliance test, the Supreme Court reasoned that the rationale for the Fourth Amendment

25   exclusionary rule was to deter unlawful police conduct.  If, after reviewing an affidavit and application

26   for a search warrant, an issuing judge incorrectly concludes the affidavit states probable cause, the

27   mistake is made by the judge not the police officer.  Since the purpose of the exclusionary rule is not

28   furthered by the exclusion of evidence taken under circumstances in which it is the judge, rather than

the police officer, who makes the mistake, the officer's "good faith" in applying for the search warrant precludes suppression of evidence as long as the officer's reliance on the warrant was objectively reasonable.  Evidence seized pursuant to a facially valid search warrant which later is held to be invalid may nevertheless be admissible if officers conducting the search acted in "good faith" and in reasonable reliance on the warrant.  Leon, 468 U.S. at 926.  Thus, evidence seized pursuant to a search warrant in this case is admissible, even if the issuing judge erred in finding probable cause under the Leon "good faith" doctrine.

Leon recognized four circumstances in which the "good faith" doctrine would not apply to avoid suppression.  They include: (1) where the issuing magistrate was misled by information in the affidavit which was knowingly or recklessly false; (2) where the issuing magistrate had abandoned the detached and neutral judicial role; (3) where the affidavit was so lacking in probable cause as to render official belief in its existence entirely unreasonable; or (4) where the warrant is so facially deficient in failing to particularize the place to be searched or things to be seized that the executing officers could not reasonably presume it to be valid.

Yost claims the search warrant lacked probable cause and was so deficient the issuing judge abandoned her neutral and detached role.  The court has found that the issuing judge had a substantial basis for concluding probable cause existed for the issuance of this search warrant for evidence of narcotics violations and ties with the Aryan Warriors prison gang.  The court has also found that the search warrant lacked probable cause to believe that firearms or ammunition would be found in the searched premises.  However, it does not appear that firearms or ammunition was seized.  Moreover, assuming officers did seize firearms or ammunition from the Yost residence because they were aware he was a convicted felon, any seizure that occurred in a place where the officers were lawfully authorized to be by virtue of the search warrant would be justified under the plain view exception.

Yost's arguments that officers could not search for and seize evidence establishing the identity of persons in control of the premises is clearly contrary to established Ninth Circuit law.  The government's description of items seized during this search does suggest that certain items not specifically authorized in the warrant were seized.  Based on the description of some of the items, for example, false Nevada drivers' licenses bearing alias names and fake social security numbers and

1  cleared and unaltered fraudulent checks, fraudulent driver's license templates, and fraudulent Nevada

2  identification and driver's license cards and blank check templates, the government <u>may</u> have a valid

3  argument that the plain view doctrine justified their seizure.  The court simply cannot determine from

4  the parties' briefs what items of evidence the government intends to introduce at trial and whether the

5  plain view doctrine applies.  The court will, therefore, recommend that the government be required to

6  disclose to defense counsel thirty days prior to trial what specific items of evidence seized in the search

7  of Yost's residence the government intends to introduce at trial, and for those items not specifically

8  authorized by the search warrant, what exception to the search warrant requirement permits the

9  introduction of the evidence not specifically authorized to be seized.

10        Having reviewed and considered the matter,

11        **IT IS THE RECOMMENDATION** of the undersigned United States Magistrate Judge that

12  Yost's Motion to Suppress (Dkt. #422) be DENIED.

13        **IT IS FURTHER RECOMMENDED** that the government be required to disclose to counsel

14  for Yost, thirty days before trial, which of the items seized during the search of his residence at

15  5920 Vicki Ann Road the government intends to introduce at trial to enable counsel for Yost to object

16  to the introduction of the evidence on Fourth Amendment grounds.

17        **IT IS FURTHER RECOMMENDED** that before the government be permitted to introduce

18  any evidence seized from Yost's residence not specifically authorized in the description of items to be

19  seized in the search warrant that the government be required to establish that the plain view exception

20  to the warrant requirement justified the seizure of these items of evidence.

21        Dated this 26th day of March, 2009.

22

23

24  PEGGY A. LEEN
    UNITED STATES MAGISTRATE JUDGE

25

26

27

28

16